578 A.2d 988

**LANCASTER LABORATORIES, INC., Petitioner,**

**v.**

**COMMONWEALTH of Pennsylvania, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 2, 1990.

Decided July 16, 1990.

Bart J. DeLuca, Jr., Sr. Deputy Atty. Gen., with him, Paul S. Roeder, Chief Counsel, Dept. of Revenue, and Ernest D. Preate, Jr., Atty. Gen., for respondent.

Russell J. Ober, Jr., Rose, Schmidt, Hasley & DiSalle, for petitioner.

Before CRAIG and PELLEGRINI, JJ., and BARBIERI, Senior Judge.

CRAIG, Judge.

Lancaster Laboratories, Inc. appeals an order by the Board of Finance and Revenue which, concluding that Lancaster did not qualify for a manufacturing exclusion or exemption, assessed a use tax deficiency against Lancaster.

In general, this court must consider whether Lancaster's actions, with respect to its clients' samples, support use tax exemption by constituting manufacturing in itself, or quality control related to manufacturing, or product improvement research. This court affirms the board's order in part and reverses it in part.

As our findings, we hereby adopt the facts as stipulated by the parties. In summary, the parties have stipulated that Lancaster is engaged in the business of providing scientific analysis, research and testing for its clients. Upon being advised as to the type of information which each client desires, Lancaster performs an integrated series of operations or procedures on samples provided by the client. For those operations, Lancaster purchased laboratory equipment, computers and related supplies during the audit period of January 1, 1982 through April 30, 1985.

Specifically, Lancaster organized its operation during the audit period into six departments: Chemistry I (Food and Drug), which performs analyses for drug potency, comprehensive nutritional labeling analyses for food products and

miscellaneous food analyses; Chemistry II (Water Quality), which involves verification of the efficiency of pollution control and treatment equipment and facilities; Chemistry III (Industrial Hygiene), which performs primarily asbestos testing and studies of building materials; Chemistry IV (Inorganic Chemistry), which tests solid and liquid waste materials for heavy metals; Chemistry V (Organic Chemistry), which tests water or waste materials for the presence of various organic compounds; and Microbiology, which conducts studies to ascertain the presence of bacteria or extraneous matter in food products.

The respective departments then use the purchased equipment and computers to reduce the client-provided samples, which are in various stages of production, by separating them into components and measuring or analyzing those components. Upon completion of the analyses, Lancaster provides the client with a report containing the information requested.

The Bureau of Sales and Use Tax commenced its audit on May 7, 1985, and determined that Lancaster's purchases are subject to the use tax. The bureau assessed a use tax against Lancaster in the amount of $107,530.35, plus an understatement penalty and a failure-to-file penalty.

Lancaster acknowledged a use tax deficiency in the amount of $1228.30, but filed a petition for reassessment on the ground that it uses the purchased equipment for excluded or exempted manufacturing activity. Thus, Lancaster contested a use tax deficiency in the amount of $106,302.05. Lancaster also requested abatement of both penalties on the ground that it believed in good faith that it did not owe the tax.

After conducting a hearing on December 18, 1985, the Board of Appeals affirmed the assessment of the use tax, but abated the penalties. Lancaster then filed a petition for review with the Board of Finance and Revenue, which affirmed the decision of the Board of Appeals on October 29, 1986.

Both boards concluded that Lancaster does not qualify for a manufacturing exclusion or exemption because (1) Lancaster's activities do not result in a "product"; (2) Lancaster's testing and inspection relate substantially to the clients' raw material or finished products, not property within the production cycle; and (3) Lancaster's research involves analyses of raw materials or finished products, not developmental products.

Lancaster now appeals the decision of the Board of Finance and Revenue to this court, which conducted its own evidentiary hearing on November 28, 1989.

Section 201(o)(4)(B)(i) of the Tax Reform Code of 1971,[1] provides an exclusion from use tax for machinery, equipment and supplies used directly in "[t]he manufacture of personal property." Section 201(c) of the Code, 72 P.S. § 7201(c), defines "manufacture," in relevant part, as:

The performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, which place any personal property in a form, composition or character different from that in which it is acquired whether for sale or use by the manufacturer, and shall include, but not limited to—

(1) Every operation commencing with the first production stage and ending with the completion of personal property having the physical qualifies [sic] (including packaging, if any, passing to the ultimate consumer) which it has when transferred by the manufacturer to another;

. . . .

(5) Research having as its objective the production of a new or an improved (i) product or utility service, or (ii) method of producing a product or utility service, but in either case not including market research or research having as its objective the improvement of administrative efficiency.

Additionally, 61 Pa.Code § 32.32(a) provides, in part:

1. Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. § 7201(o)(4)(B)(i).

(a) *Equipment, machinery, parts, and foundations therefor and supplies used directly in manufacturing or processing.* The purchase or use of tangible personal property or services performed thereon by a person engaged in the business of manufacturing or processing shall be exempt from tax if such property is predominantly used directly by him in manufacturing or processing operations.

. . . .

(2) *Property directly used; predominant use.* The purchase or use by a manufacturer or processor of property in the following categories, when predominantly used directly in manufacturing or processing, shall be exempt from tax.

. . . .

(iii) *Testing and inspection.* Property used to test and inspect the product throughout the production cycle, shall be considered to be directly used in manufacturing-processing operations.

Therefore, the pivotal issues in determining whether Lancaster qualifies for a manufacturing exclusion or exemption are whether the separation of components contained in a sample constitutes (1) the formation of personal property that is in a form, composition or character different from that in which it was acquired (section 201(c)(1) of the Code); (2) or testing and inspection during the production cycle of a client's manufacturing of a product (61 Pa.Code § 32.32(a)(2)(iii)); or (3) research having as its objective the production of a new or improved product. (Section 201(c)(5) of the Code.)

Lancaster contends (1) that it changes every test sample in form, composition or character, which results in a "product" of information and knowledge; (2) that it tests and inspects the products during the production cycle as an actual manufacturer would; and (3) that information obtained by the purchased equipment provides a breakdown of a product's nutritional content, which could lead to the development of a new or improved product.

The Commonwealth asserts that Lancaster is not a manufacturer because Lancaster does not change the form, composition or character of personal property into a different product. Furthermore, the Commonwealth argues that, because Lancaster is not a manufacturer, Lancaster is not entitled to the testing and inspection exemption. Additionally, the Commonwealth contends that Lancaster is not engaged in research because Lancaster's activity is nothing more than quality control, which does not relate to the production of a new or improved product.

### 1. Manufacturing

The first issue is whether Lancaster places personal property in a form, composition or character different from that in which it was acquired, thus qualifying Lancaster as a manufacturer.

Section 201(c) of the Code, the statutory definition of "manufacture," does not specify that a manufacturer produce tangible personal property. However, the regulatory definition of "manufacturing" states that "[t]he change in form, composition or character shall result in a different product having a distinctive name, character and use." 61 Pa.Code § 32.1.

Lancaster contends that the definition of manufacturing found at 61 Pa.Code § 32.1 is not applicable because the requirement that the change shall result in a different *product* violates the "clear and unambiguous" language of the statute, which imposes no such requirement.

Regulations which are contrary to the legislative intent of related statutory provisions are invalid. *Clough v. Tax Review Board,* 20 Pa.Commonwealth Ct. 464, 342 A.2d 483 (1975). However, a regulation is valid when it is interpretive rather than destructive of the statute. *Id.*

The statutory definition of "Manufacture" refers to placing any personal property in a different form, composition or character. The regulation defines the resulting different form, composition or character of personal property as a

"product." Because the regulation merely gives a name to that which necessarily results from the altered form, composition or character of personal property, the regulation is interpretive, and therefore, applicable.[2]

 Dr. Fred R. Albright, Senior Vice President and Director of the Health Sciences Division of Lancaster Laboratories, testified that Lancaster's analytical procedures changed the form, composition or character of the clients' submitted test samples. However, nothing in the record indicates that Lancaster's activities resulted in the formation of a product.

Lancaster contends that information and knowledge obtained from the testing are products of altered personal property. "Personal property" is defined generally as

everything that is the subject of ownership, not coming under denomination of real estate. A right or interest in things personal ... or any right or interest which one has in things movable.

Black's Law Dictionary 1096 (5th ed. 1979). Because information and knowledge are not subjects of ownership or movable objects, they are not products of altered personal property.

The results of Lancaster's activities are components of products, and these components do not have physical qualities which are passed ultimately to the consumer or another manufacturer. 72 P.S. § 7201(c)(1). Therefore, because Lancaster's separation of samples into components does not result in the formation of a different type of personal property, Lancaster is not a manufacturer in itself.

## 2. Testing and Inspection

 The fact that Lancaster does not manufacture a distinct product does not preclude Lancaster from qualifying for a manufacturing exemption. Title 61 Pa.Code § 32.32(a) provides that property used to test and inspect a

2. The contents of the Pennsylvania Code are judicially noticed. 1 Pa.Code § 5.8.

product throughout the production cycle is exempt from tax. Furthermore, "it is not the identity of the party who performs the work but the nature of the work done that should control the allowance or denial of the exclusion." *Commonwealth v. R.G. Johnson Co.*, 495 Pa. 256, 260–61, 433 A.2d 465, 468 (1981).

Therefore, the second issue is whether Lancaster uses the purchased equipment directly in the testing and inspection of products in a manufacturer's production cycle, i.e., whether the use amounts to performance of part or all of the quality control function during the cycle.

Dr. Albright's uncontradicted testimony and corresponding exhibit indicate that Lancaster's predominant use of the equipment involves testing samples for tax-exempt manufacturing entities. However, the Commonwealth contends, as the Board of Appeals determined, that Lancaster's testing and inspection of the raw materials or finished products does not occur within the production cycle.

"Cycle" is defined as "an interval of time during which one sequence of a regularly recurring succession of events or phenomena is *completed.*" Webster's Third New International Dictionary 563 (1986) (emphasis added). Section 201(c)(1) of the Code defines the completion of the production stage as personal property having the qualities, including any packaging, which is then transferred by the manufacturer to another.

Hence, as long as the manufacturer (Lancaster's client) retains control of the personal property, thus creating the possibility that the property could undergo further changes, the property is still within the production cycle. The property is removed from the production cycle when the manufacturer treats the product as "completed" and transfers it to the ultimate consumer or another manufacturer. In the event that the original or a succeeding manufacturer decides to alter the formerly completed product, a new production cycle commences.

In the present case, the record supports the fact that the majority of Lancaster's testing and inspection of its clients' samples occurs before the client releases the product as completed, much as a worker on an automobile assembly line would inspect cars to see that they have four tires before the car is priced and shipped. Therefore, that percentage of Lancaster's use of its equipment for the purpose of testing and inspection of property still within the production cycle is exempt from the imposition of use tax.

### 3. Research

Lancaster also uses equipment to develop information which clients then employ in labeling their products. Dr. Albright testified that approximately 40% of the work performed by the Chemistry I department and 10% of the work performed by the Chemistry IV department consists of nutritional analyses for the purpose of labeling the product.

■ The labeling of a product occurs *after* the manufacturer considers the product to be in a completed form. Because section 201(c) of the Code states that the manufacturing operation ends with the completion of a product, labeling is not part of the manufacturing operation. Thus, the percentage which Lancaster used its equipment for labeling purposes does not qualify for the testing and inspection exemption.

■ Therefore, the final issue is whether analytical testing performed to acquire information for labeling purposes falls within the research provision of the manufacturing exclusion.

Section 201(c)(5) of the Code specifies that the research must have as its objective a new or improved product or service. Moreover, 61 Pa.Code § 41.9(e) significantly provides:

> The [research] exemption does not apply to the purchase or use of property or services to be used indirectly in research operations nor is the exemption applicable to the purchase or use of property or services to be used in

managerial activities, *sales activities,* or other nonoperational activities of a research establishment or project. (Emphasis added.)

Dr. Albright's testimony indicates that Lancaster's label-related testing is for sales activities:

Q. Could you describe for the Court why it is that your clients wanted Lancaster Laboratories to do nutritional analyses on their products?

A. Well, often it's for a *competitive edge.* There are two types of labels on the food product. One is the ingredient label, which is required by law. The nutritional label is not required by law unless one makes a claim or, in fact, does add a nutrient. Then it is required. And the regulations stipulate that full nutritional labeling requires calories, protein, fat, carbohydrates and a series of vitamins and sodium, calcium and iron as elemental analyses. So, on numerous occasions we have had clients ask us to analyze their products to determine if they should label *whether they had a competitive advantage or could do something to that product that would give it a competitive advantage,* such as low cholesterol or low sodium, so they may be required to fortify the product with vitamins. (Emphasis added.)

Therefore, the percentage which Lancaster used the purchased equipment for labeling purposes is subject to the imposition of the use tax.

Accordingly, the decision of the Board of Finance and Revenue is affirmed to the extent which Lancaster used the equipment for labeling, but reversed to the extent which Lancaster used the equipment for testing and inspection during the production cycle and remanded for that determination as well as a recomputation of appropriate interest.

## ORDER

NOW, July 16, 1990, subject to the filing of exceptions under Pa.R.A.P. 1571(i), the order of the Board of Finance and Revenue, dated October 29, 1986, at No. RST–9912, is:

1. Affirmed as to the abatement of penalties and the tax liability assessed for the use of equipment and supplies employed by Lancaster in its labeling activities;

2. Reversed as to the tax liability assessed for the use of equipment and supplies employed by Lancaster in its testing and inspection activities, and this case is remanded to the Board of Finance and Revenue for a determination of the percentage of Lancaster's use of the equipment for such exempt testing and inspection activities; and

3. Vacated as to the computed interest in the amount of $20,986.32, and the case is remanded to the Board of Finance and Revenue with directions to recompute and assess interest accordingly.

Jurisdiction relinquished.

Former President Judge CRUMLISH, Jr., did not participate in the decision in this case.