**AMP INCORPORATED, Petitioner,**

**v.**

**COMMONWEALTH of Pennsylvania, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 3, 2001.

Decided Feb. 22, 2002.

Publication Ordered Jan. 2, 2003.

John H. Enos, III and Craig A. Longyear, Harrisburg, for petitioner.

Bart J. DeLuca, Harrisburg, for respondent.

BEFORE: McGINLEY, J., and FRIEDMAN, J., and MIRARCHI, Senior Judge.

OPINION BY Judge McGINLEY.

AMP Incorporated (Taxpayer) seeks review of an order of the Board of Finance and Revenue (Board) denying use tax relief for taxpayer's purchases of various categories of equipment for the period April 1, 1990, through March 31, 1994.

Taxpayer manufactures, sells, and distributes solderless electrical/electronic devices and products, such as splicers, connectors, cable and panel assemblies, networking units, sensors, switches, and fiberoptic devices (Product). Stipulations of Fact, April 4, 2001, (Stipulation) 10–11.

Taxpayer's manufacturing plants are located throughout Pennsylvania and Virginia. Stipulation 15. In the 1990's Taxpayer constructed a distribution center (PADC) in Mechanicsburg, Pennsylvania, which receives production output from fifteen of its facilities located in Pennsylvania and Virginia. Stipulation 13, 15, 16.

To operate the PADC, Taxpayer purchased four classes of equipment, which are at issue here: shelving/racks (Shelving/Racks); forklifts/order pickers (Forklifts/Orderpickers); conveyors (Conveyors); and packaging equipment (Packaging Equipment).

Taxpayer uses the Shelving/Racks to house the Product shipped to the PADC from the Pennsylvania and Virginia manufacturing facilities. The Forklifts/Orderpickers move the Product off and on the shelving racks. The Conveyors move the Product in and out of the various PADC departments. Packaging Equipment places manufactured Product into small boxes, self-sealing plastic bags or rigid blister packs or puts small components into bags according to weight. The Pack-

aging Equipment also forms and seals cartons and shrink-wraps palletized Product. Stipulation 19.

Prior to shipping to the PADC, Taxpayer's Pennsylvania and Virginia manufacturing facilities wrap their Product and place it in cartons for distribution. Stipulation 17. When the PADC receives the Product, the cartons are inspected and weighed. Less than fifty percent of the Product is inspected. Stipulation 20. The Product is stored in anticipation of a customer order. The Product remains at the PADC for an average of five and one-half weeks. Stipulation 21.

In response to a customer order, the Product is withdrawn from inventory. Because customers frequently order the Product in amounts different from the amounts in the cartons, most orders are repackaged and moved to shipping. Repackaging is done in two different ways. When an order calls for the retrieval of the Product, which is bagged in bulk, the bagged Product (which may be in a carton) is removed from storage with the use of Forklift/Order picker. The bag is opened and then the correct amount of Product is placed in a new bag. The rebagged order moves along a conveyor line until placed in a carton and sealed and an address label affixed for shipping. Stipulation 23.

Items are also removed and reboxed if a customer orders a smaller quantity than the amount contained in a carton. When an order requires the opening of a carton, the carton is removed from storage with the Forklift/Order picker, transported to a revolving rack shelving system where the carton is opened manually and an appropriate number of Product removed. The ordered Product is placed in a new carton, which moves along the Conveyor until sealed and a shipping label affixed. Stipulation 23. Approximately eighty-two per-

cent of orders require opening and repackaging of at least one carton. Stipulation 24.

Procedurally, the Pennsylvania Department of Revenue (Department) conducted a sales and use tax audit of Taxpayer for the period from April 1, 1990, to March 31, 1994. As a result the Department assessed a sales tax of $502.00 and a use tax of $1,863,234.00 on Taxpayer's purchase of equipment as well as interest in the amount of $701,667.00 and penalties of $152,381.00 for a total assessment of $2,717,785.00. Stipulation 3.

Taxpayer contested the entire tax and petitioned for reassessment and abatement of penalties with the Board of Appeals. The Board of Appeals reduced the use tax to $1,482,663.00 and sustained the sales tax, penalties and interest. Stipulation 4.

On January 20, 1998, Taxpayer contested the entire amount with the Board. The Board sustained the sales tax assessment and reduced the use tax assessment to $1,463,041.00 plus appropriate interest. The Board abated penalties. Stipulation 5.

On May 15, 2001, Taxpayer applied to this Court to supplement the record on appeal to include "Analysis of House Bill 337 (Printer's No. 160) Session of 1957" (Analysis of House Bill 337). The Court allowed the analysis to become part of the record reserving questions as to the evidence's weight sufficiency and materiality

to be decided with the merits. Order of Court, June 13, 2001, at 1.[1]

On appeal to this Court, Taxpayer continues to contest the use tax and interest. In the interim, the parties settled a portion of the assessment. The settlement agreement provided that Taxpayer is entitled to a reduction in the use tax in the amount of $276,666.00 plus appropriate interest regardless of the outcome of this case. Stipulation 30, 31.

The Department assessed use tax of $73,912.56 on the Shelving/Racks used to store the Product, assessed use tax of $49,504.52 on the Forklifts/Orderpickers used to place and retrieve the Product to and from the shelves, assessed a use tax of $103,616.57 on the Conveyors used to move the Product within the distribution center, and assessed a use tax of $36,265.60 on the Packaging Equipment. Stipulation 19. In total Taxpayer requests an additional $263,299.00 reduction in the use tax based on the manufacturing exclusion.

Taxpayer argues[2] that the manufacturing exclusion applies to the four classes of equipment used in the continued handling and packing of its manufactured the Product. In other words, Taxpayer contends: (1) equipment used predominantly and directly in operations occurring after the first production stage, which use ends with the wrapping of its manufactured Product for shipment to other manu-

---

1. Analysis of House Bill 337 written by the Department of Justice of the Commonwealth prior to the passage of the amendment to the Tax Reform Code (Code), Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. § 7201, which included the language that manufacture shall include "every operation commencing with the first The Production stage and ending with the completion of personal property having the physical qualities (including packaging, if any passing to the ultimate consumer) ..." concludes "[t]he effect of the proposed amendment would be to exempt all equipment used for packaging, wrapping, fill-

ing, and the material handling equipment incidental to such operations." Analysis of House Bill 337 at 9–11. Taxpayer contends this provides a basis to resolve the instant litigation. This Court disagrees.

2. This Court hears determinations of the Board in its appellate jurisdiction, but its review is de novo. *Hilltop Properties Associates Limited Partnership v. Commonwealth of Pennsylvania,* 768 A.2d 1189, 1191 n. 2 (Pa. Cmwlth.2001).

facturers, qualifies for the use tax manufacturing exclusion; and (2) a purchaser of manufactured property who performs additional manufacturing operations on the purchased property prior to transferring such property to another is an "ultimate consumer," and therefore, the manufacturing exclusion applies to purchases of equipment used predominantly in the packing of manufactured property sold to another manufacturer.

Section 202 the Code, 72 P.S. § 7202, imposes a tax upon every "sale at retail" or "use." Section 201(*o*), 72 P.S. § 7201(*o*), sets forth the manufacturing exclusion "the term 'use' shall not include ... the manufacture of tangible personal property." Section 201(c), 72 P.S. § 7201(c)(1), defines manufacturing:

> The performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, which place any tangible personal property in a form, composition or character different from that in which it is acquired whether for sale or use by the manufacturer, and shall include, but not be limited to—
>
> (1) [e]very operation commencing with the first production stage and ending with the completion of tangible personal property having the physical qualities (including packaging, if any, passing to the ultimate consumer) which it has when transferred by the manufacturer to another;

■ The "exclusion ends when the manufacturer treats the product as completed so that it may be transferred to . ... another manufacturer." *M & M/Mars, Inc. v. Commonwealth,* 162 Pa.Cmwlth. 375, 639 A.2d 848, 852 (1994), *affirmed,* 540 Pa. 635, 658 A.2d 797 (1995). In *Lancaster Laboratories, Inc. v. Commonwealth of Pennsylvania,* 148 Pa.Cmwlth. 465, 611 A.2d 815 (1992)(*Lancaster II*), this Court stated:

Therefore, although the regulatory requirement of a 'different' product is not expressly stated in the statute, manufacturing under § 201(c) must include transformed property for sale or use by the manufacturer that is passed ultimately to the consumer or another manufacturer, which is necessarily a different product with a distinctive name, character and use.

*Lancaster II,* 611 A.2d at 817.

■ In *Lancaster Laboratories, Inc. v. Commonwealth,* 134 Pa.Cmwlth. 59, 578 A.2d 988 (1990) (*Lancaster I*), *exceptions denied in part, granted in part,* 148 Pa. Cmwlth. 465, 611 A.2d 815 (1992) we noted:

> [A]s long as the manufacturer ... retains control of the personal property, thus creating the possibility that the property could undergo further changes, the property is still within the production cycle. The property is removed from the production cycle when the manufacturer treats the product as 'completed' and transfers it to the ultimate consumer or another manufacturer. In the event that the original or a succeeding manufacturer decides to alter the formerly completed product, a new production cycle commences.

*Lancaster I,* 578 A.2d at 992–993.

Here, none of the Product is manufactured at the PADC. It is wrapped and shipped to the PADC and stored until selected and retrieved to fill a customer's order. The Product is weighed and inspected on arrival. In some instances it is rewrapped. At no time is the Product changed. This Court finds that the activities at PADC most closely resemble post-production activities as described in 61 Pa.Code § 32.32(a)(3)(iii)(I):

> Post Production activities. Property used to transport or convey the finished

product from the final manufacturing or processing operation, which includes but does not extend beyond the operation of packaging for the ultimate consumer, and storage facilities or devices used to store the product are not used directly in manufacturing or processing and are taxable. For example, equipment which loads packaged products into cases or cartons for ease of handling in delivery shall be subject to tax.

Taxpayer contends that applying Department regulations to the equipment at issue also leads to the conclusion that the equipment is directly used in its manufacturing operations. Department regulations state:

In determining whether property is directly used, [in manufacturing] consideration shall be given to the following factors:

(i) The physical proximity of the property in question to the production process in which it is used.

(ii) The proximity of the time of use of the property in question to the time of use of other property used before and after it in the production process.

(iii) The active causal relationship between the use of the property in question and the production of a product. The fact that particular property may be considered essential to the conduct of the business of manufacturing or processing because its use is required either by law or practical necessity does not of itself, mean that the property is used directly in the manufacturing or processing operations.

61 Pa.Code § 32.32(a)(1).

Taxpayer asserts that the four classes of equipment here are physically proximate to manufacturing because substantially all of the equipment used at PADC involves packaging. The fact that its final production operations occur at a facility separate and apart from its Pennsylvania and Virginia manufacturing plants is irrelevant. With respect to the proximity in time of use of the property, Taxpayer argues the PADC equipment represents a stage in an integrated production process. 61 Pa. Code § 41.5. Finally, with respect to the third factor, Taxpayer asserts that all of the equipment at issue physically touches the manufactured Product during the process storage and packaging procedures at PADC.

■ Regulations within the Department's authority are entitled to great deference and should not be ignored absent a showing of actual conflict with the statute. *Tool Sales and Service Co. v. Commonwealth,* 536 Pa. 10, 637 A.2d 607 (1993).

Considering the three factors, this Court finds that the property is not directly used in manufacturing. Therefore, Taxpayer's equipment is ineligible for the manufacturing exclusion. With respect to the proximity test, no manufacturing occurs at the PADC, which is geographically independent from Taxpayer's manufacturing plants located throughout Pennsylvania and Virginia.

With respect to proximity in time, Taxpayer's Product is stored for five and one-half weeks at PADC. This five and one-half weeks of storage compels the conclusion it is not used proximate in time to the manufacturing process.

With respect to the third factor, this Court finds that the PADC is not part of an in-process storage facility or an integrated plant. First, the manufacturing process ends five and one-half weeks before the Packaging Equipment at the PADC is used. Second, no changes occur to the Product at the PADC; essentially the Product arrives as finished ready for shipment and sale. Therefore, because Taxpayer's equipment is not directly used

in any true manufacturing operations, but in the post-production stage, Taxpayer is not entitled to the manufacturing exclusion.

Next, Taxpayer asserts that because it sells the vast majority of its Product to other manufacturers who use its Product as "raw materials" in their products Taxpayer's customers are the "ultimate consumers" and the equipment used to package these "raw materials" is entitled to the manufacturing exclusion. Taxpayer draws attention to the fact that the manufacturing exclusion is broadly stated so as to apply to property used directly in the manufacture of tangible personal property. In *Mars,* this Court stated that "[t]he [manufacturing] exclusion ends when the manufacturer treats the product as completed so that it may be transferred to the ultimate consumer or another manufacturer." *Mars,* 639 A.2d at 852. Taxpayer asserts that the language "including packaging, if any passing to the ultimate consumer" cannot be construed as anything other than an enlargement of the concept of those "physical qualities" that the manufactured tangible personal property has transferred to "another."

The Department contests this interpretation and asserts that a manufacturer is not entitled to use tax exclusion on purchases of packaging equipment unless the packaging applied therewith passes to an "ultimate consumer." Then, also relying on *Mars,* the Department notes that the PADC Packaging Equipment does not package for the ultimate consumer because the ultimate consumer is the end retail purchaser. The Product is shipped from the PADC to another manufacturer or distributor, not an ultimate consumer. To accept Taxpayer's definition of ultimate consumer would render the phrase "including packaging, if any passing to the ultimate consumer" at 72 P.S. § 7201(c)(1) meaningless.

In *Mars,* this Court determined that packaging machinery used to package 24 and 36–count candy bars in cartons which were then sold to grocery stores, food warehouses and food distributors, was entitled to the manufacturing exclusion despite the Department's argument that the 24 and 36–count candy bar cartons did not pass to the ultimate consumer. *Mars,* 639 A.2d at 852. We noted that there was no support for the proposition that the manufacturing exclusion did not apply because someone other than the ultimate consumer may purchase some of the 24 and 36–count cartons. *Id.* Central to our reasoning and pivotal to the analysis was the Department's stipulation that some packaged cartons passed to the ultimate consumer and the fact that each carton contained consumer information, and the cartons were obviously designed and produced for the consumer. *Id.*

In the present controversy, unlike *Mars,* Taxpayer does not ship its Product to retail customers but rather to other manufacturers and distributors. This Court agrees with the Department that "ultimate consumer" means the last in line or final destination. Packaging passing to the ultimate consumer occurs after the manufacturing process. Also, in *Mars,* immediately after the manufacturing process the taxpayer wrapped its candy bars. Here, Taxpayer's packaging occurs at a time and place remote from the manufacturing process and is in fact unrelated to the manufacturing process in Taxpayer's Virginia or Pennsylvania plants.

Therefore, this Court finds that the PADC does not package the Product for the ultimate consumer and is not entitled

to claim the manufacturing exclusion.[3]

### *ORDER*

AND NOW, this 22nd day of February, 2002, subject to the filing of exceptions within thirty (30) days under Pa.R.A.P.(i), the Order of the Board of Finance and Revenue dated July 20, 1998, finding Taxpayer's equipment purchases set forth in Paragraph 19 of the Stipulation of Facts, April 4, 2001, subject to tax is affirmed.

In accordance with Paragraph 31 of the Stipulation of Facts, pursuant to the relief stipulated and agreed to by the parties, the previously reassessed use tax of $1,463,041.34 shall be reduced to $1,186,374.94. The Pennsylvania sales tax reassessment shall remain at $502.00 plus appropriate interest.

---

**3.** Because we find the equipment at issue to be used in post-production activities and not directly in manufacturing operations, we need not address the evidence, weight, sufficiency and materiality of "Analysis of House Bill 337."